NEWHALL *v.* APPLETON *et al.*

(*Superior Court of New York City, General Term.* June 27, 1890.)

MASTER AND SERVANT—COMPENSATION—EVIDENCE.
> An action for a canvasser's commissions involved the issue whether plaintiff was entitled to pay when his orders were sent in, or, as defendants claimed, when the subscriptions were "proved." It appeared that there was no inflexible rule when canvassers become entitled to their pay, that some canvassers would not work on "proved" orders, and that plaintiff had a reputation as a canvasser. Plaintiff testified that his pay did not depend on his orders being proved, and this was corroborated by several witnesses, but was contradicted by defendants' witnesses. *Held,* that a judgment in his favor would not be disturbed.

Appeal from judgment on report of referee.
Action by George T. Newhall against William H. Appleton and others, to recover commissions as canvasser. The issues were referred to George M. Van Hoesen, Esq., who found in favor of plaintiff and filed the following opinion:

"We start with the undisputed fact that Newhall was in the employ of Appleton as a canvasser. The terms of the employment are in dispute, Newhall insisting that he became entitled to his pay when he obtained for and delivered to the Appletons a *bona fide* subscription, and the Appletons, on the other hand, insisting that it is not enough that a subscription should be *bona fide,* but that it must also be proved. A subscription is not proved until the subscriber has paid a certain part of the subscription price of the book for which he has subscribed. Where a book is issued in parts, or serial numbers, the publisher determines how many parts must be paid for by the subscribers before the canvasser shall be entitled to compensation for his services in procuring the subscription. When the subscriber has paid for the number of parts that the publisher has designated, the subscription, in the language of book publishers, is 'proved.' There is no rule as to the number of parts necessary to 'prove' a subscription. At the option of the publisher, it may be 5, or 10, or 15, or any other number. The canvasser could never know when he would be entitled to his pay unless the publisher, in employing him, should tell him what number of parts would be required to prove a subscription, which is commonly called an 'order.' The pay was not the same to all canvassers. For obtaining a subscriber to Picturesque Europe or Picturesque America, four dollars was allowed to some, and only three dollars to others. Nor was there an inflexible rule as to the time at which canvassers became entitled to payment. With new men, and with men who had not proved their ability and their trustworthiness, it was the rule to withhold payment until the order or subscription had been proved. The contract with such men usually provided that they should not be paid until the subscriber had taken the prescribed number of parts. Experienced canvassers would naturally inquire, and without such inquiry fair-dealing publishers would voluntarily inform the canvasser with whom they were negotiating, how many parts would 'prove' the order. But, as canvassers are commonly men of small means, it has been customary for publishers to make to them small advances for their living and traveling expenses. These advances were not a matter of right,

but were made because it was to the advantage of the publishers to make them; for without them it is probable that many canvassers would not have been able to keep the field.    There were other canvassers, men whose reputation in the business was established, who would not work on 'proved' orders.    These men, the *elite* of their profession, insisted on getting their pay when they delivered to the publisher the orders they had procured.    That there were such men, and that they were paid when they turned in their orders, seems to me to be established by the evidence.    The plaintiff, Newhall, had not at all times had the same arrangement with the Appletons.    He had been employed as a canvasser at a salary, and he had also worked for a stipulated sum per order.    He denies that his pay ever depended upon his orders being 'proved,' and I think that he is supported in his assertion by a preponderance of evidence.    The principal witness for the defense, Mr. Davis, contradicts him, but I do not attach much, if any, weight to the testimony of Davis.    His statement on the direct examination is clear, and, if it were not shaken by the cross-examination, would be convincing; but a careful reading of his cross-examination satisfies me that no reliance can be placed upon him.    His attempt to explain why a note should have been made payable on demand, though a distinct oral agreement was made with Newhall that it should not be paid till the orders had been proved; why, if the amount to be paid was definitely and unchangeably agreed on, it was necessary to wait for the proving of the orders; and why interest should have been paid 'if the note were not payable till the orders had been proved,—seems to me not merely lame, but rather to manifest a disposition not to tell the truth.    I find, moreover, that Newhall had gained a good name as a canvasser, for Davis says: 'Hall [Appleton's superintendent] told me that Newhall's orders were running very good, and I could afford to pay him almost up to the full price; that they were delivering up very fairly; and that Newhall took very good orders.'    This seems to me to have been likely to induce Davis to regard Newhall as entitled to admission into the select circle of canvassers who were paid when their orders were presented, specially when strong inducements were needed to get the latter to go to Texas.    Newhall had objections to canvassing in Texas, and Davis was compelled to use persuasion.    In face of that fact, I think it most improbable that he made any such declarations as he professes to have made respecting buying out Newhall's list.    To read Davis' testimony, one would think that Newhall was anxious to go to Texas, and that Davis was utterly indifferent as to whether he went or not.    But the truth is Davis was persuading, and was not dictating terms.    Besides, I find that Newhall, *ante litem motam,* while in Arkansas and in New Orleans, took the position that his pay did not at all depend upon his orders being proved.    His employment of Holbrook, and his statement to Baker, which I see no reason to suspect that he made with a view to a dispute with the Appletons, show that while at work he actually believed that he was to be paid when his orders were presented.    Furthermore, he is corroborated by Genin and Glover, neither of them strong as a witness, but both, I think, men who wished to be truthful. The preponderance of evidence seems to me to be on the side of the plaintiff, and therefore it is my duty to direct judgment in his favor.    I am aware that men of excellent judgment have reached a different conclusion, and I see why they have done so.    There is a good deal to be said, and a strong argument can be made, in support of the position taken by the defendants.    The risk that publishers would run if they should pay every canvasser as he presented the name of an alleged subscriber is so great that men of good judgment have doubted if any canvasser is ever paid in full before his orders had been proved, but the safety of the publishers lay in their power to discriminate between good canvassers and bad.    The plaintiff should have judgment."

Judgment was entered for plaintiff, and defendants appeal.

Argued before FREEDMAN and TRUAX, JJ.

*Campbell & Paige*, for appellants.    *W. W. Badger*, for respondent.

PER CURIAM. Judgment appealed from is affirmed, with costs, on the opinion of the referee.